UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| RICARDO OCHOA-BELTRAN, | ) |
| Petitioner, | ) ) ) |
| v. | ) ) Case No. 1:22-cv-00866-TWP-MJD |
| UNITED STATES OF AMERICA, | ) ) ) |
| Respondent. | ) |

**ORDER DENYING MOTION FOR RELIEF PURSUANT TO 28 U.S.C. § 2255 AND DENYING CERTIFICATE OF APPEALABILITY**

This matter is before the Court on an Amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence filed by Petitioner Ricardo Ochoa-Beltran ("Ochoa-Beltran") (Dkt. 8). Ochoa-Beltran challenges his guilty plea and sentence, asserting that he was deprived of constitutionally effective assistance of counsel and that his plea was not made knowingly and voluntarily. For the reasons that follow, his motion is **denied**. In addition, the Court finds that a certificate of appealability should not issue.

## I.  THE § 2255 MOTION

A motion pursuant to 28 U.S.C. § 2255 is the presumptive means by which a federal prisoner can challenge his conviction or sentence. *See Davis v. United States*, 417 U.S. 333, 343 (1974). A court may grant relief from a federal conviction or sentence pursuant to § 2255 "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). "Relief under this statute is available only in extraordinary situations, such as an error of constitutional or jurisdictional magnitude or where a fundamental defect has occurred

which results in a complete miscarriage of justice." *Blake v. United States*, 723 F.3d 870, 878–79 (7th Cir. 2013) (citing *Prewitt v. United States*, 83 F.3d 812, 816 (7th Cir. 1996); *Barnickel v. United States*, 113 F.3d 704, 705 (7th Cir. 1997)).

## II. BACKGROUND

### A. Criminal Conduct

Between 2016 and July 17, 2017, Ochoa-Beltran, led a drug trafficking organization ("DTO") that transported drugs from California to Indianapolis, Indiana for re-distribution. *United States v. Ochoa-Beltran, et al.*, 1:17-cr-00165-TWP-MJD-1 ("Cr. Dkt."), (Cr. Dkt. 574 at ¶ 18). Miguel Lara-Leon ("Lara-Leon") was Ochoa-Beltran's second-in-command. *Id*. To facilitate the DTO's drug trafficking business, Ochoa-Beltran had drugs mailed to various residences throughout Indianapolis. *Id*.

Lara-Leon, Cesar Salgado ("Salgado"), Angelica Guzman-Cordoba ("Guzman-Cordoba"), Lissa Garcia ("Garcia"), and others acted as distributors for the DTO under Ochoa-Beltran's direction. *Id*. at ¶ 19. Lara-Leon and Salgado also had leadership roles and directed other DTO members, including Alfredo Cendejas, Guzman-Cordoba, Garcia, and Adonis Rodriguez. *Id*. The DTO sold drugs to a Drug Enforcement Administration ("DEA") confidential informant on at least eight separate occasions, as arranged by Ochoa-Beltran, Lara-Leon, and Salgado. *Id*. at ¶¶ 19–20.

On July 17, 2017, Ochoa-Beltran directed the confidential informant to an Indianapolis stash house located at 47 South Dearborn Street (the "Dearborn Street house") maintained by the DTO. *Id*. at ¶ 21. When the informant arrived at the Dearborn Street house, Ochoa-Beltran, Lara-Leon, Salgado, Guzman-Cordoba, Roberto Martinez-Hernandez, and another male were inside, and Ochoa-Beltran was conducting an inventory of the DTO's firearms. *Id*. Ochoa-Beltran wanted

the informant to demonstrate how to "cut" cocaine, but they did not have all the necessary supplies, so Ochoa-Beltran and the informant left to retrieve them. *Id*. at ¶ 22.

While they were out, Ochoa-Beltran and the informant stopped at a residence that Ochoa-Beltran was considering using as a marijuana grow house. *Id*. While there, Ochoa-Beltran met with and directed an associate to kill two individuals, one who owed money to the DTO and the other who was a close associate of that individual. *Id*.

Ochoa-Beltran and the informant returned to the Dearborn Street stash house, where the informant cut the cocaine at Ochoa-Beltran's direction. *Id*. at ¶ 23. Ochoa-Beltran gave the informant approximately 50 grams of heroin and directed him to take it to a drug customer. *Id*.

Based on all of this information, the DEA applied for and received a search warrant for the Dearborn Street house. *Id*. at ¶ 24. Shortly before the warrant's execution, Ochoa-Beltran and another man left the Dearborn Street house in an Audi with Lara-Leon and Roberto Martinez-Hernandez following in a pickup truck. *Id*. Both vehicles were stopped. Upon searching the Audi and Ochoa-Beltran, agents found a debit card, bank cards, handwritten forfeiture receipts, and numerous cell phones. *Id*. In the bed of the truck, agents found a crate containing nine firearms, various magazines and rounds of ammunition, and handwritten notes listing addresses of some of the DTO's stash houses. *Id*.

Inside the Dearborn Street stash house, agents found approximately 1.45 kilograms of heroin; approximately 2.12 kilograms of cocaine; approximately 56 grams of methamphetamine; approximately six firearms; drug ledgers; approximately $9,795 cash; and receipts from wire transfers. *Id*. at ¶ 25. In total, approximately 17,764 kilograms of converted drug weight was seized by law enforcement. *Id*. at ¶ 26. Conservatively, the converted drug weight of the conspiracy was at least 30,000, but less than 90,000, kilograms. *Id*. at ¶ 27.

During the conspiracy, Ochoa-Beltran directed acts of violence against organization members and customers, including pulling out the teeth of an individual suspected of stealing drugs from the organization. *Id*. at ¶ 28.

Further, the Internal Revenue Service conducted a parallel money laundering investigation which uncovered a three-prong money laundering organization ("MLO") run by Ochoa-Beltran. *Id*. at ¶ 29. The first prong of the MLO involved funnel accounts. *Id.* Ochoa-Beltran directed members of the DTO to deposit cash into their bank accounts, and then transfer the money to accounts controlled by him. *Id*. Ochoa-Beltran held multiple bank accounts in various names for this purpose, and the bank records showed that the approximate deposits made as part of the scheme totaled over $370,000. *Id*. The second prong of the MLO involved wire transfers to Mexico that totaled over $260,000. *Id*. at ¶ 30. The final prong of the MLO involved bulk cash smuggling. *Id*. at ¶ 31. For example, on January 17, 2017, several members of the DTO were stopped by Homeland Security Investigation agents in Chicago, Illinois, and found to be in possession of approximately $131,421 cash (all proceeds of the DTO). *Id*. On July 5, 2017, other officers seized approximately $17,500 of DTO proceeds from two of DTO members on an Amtrack train, which was en route to California. *Id*.

**B.** **Charges and Plea**

In 2018, Ochoa-Beltran and others were charged in an eleven-count Second Superseding Indictment. (Cr. Dkt. 237.) Ochoa-Beltran was charged with three counts: Conspiracy to Distribute Controlled Substances, in violation of 21 U.S.C. § 846 (Count 1); Distribution of Heroin, in violation of 21 U.S.C. § 841(a)(1) (Count 9); and Conspiracy to Launder Money, in violation of 18 U.S.C. § 1956(h) (Count 11). *Id*. at 1, 9, 10.

4

After being represented by two other retained defense attorneys, Ochoa-Beltran ultimately retained a third attorney, Richard A. Jones ("Jones") to represent him. (Cr. Dkts. 24, 85, 126, 127.) Jones entered his appearance on January 9, 2018. (Cr. Dkt. 126.)

On March 26, 2019, the Court held a final pretrial conference to discuss final preparations for the April 15, 2019 trial, at which Ochoa-Beltran, Lara-Leon, Guzman-Cordoba, and Joel Alvarado-Santiago would be tried. (Cr. Dkt. 455.) During the hearing, Ochoa-Beltran announced his intention to plead guilty, so a change of plea hearing scheduled following the final pretrial hearing. *Id.* at 2, Cr. Dkt. 461.

That day, Ochoa-Beltran pled guilty without the benefit of a plea agreement. (Cr. Dkt. 461.) At the plea hearing, Ochoa-Beltran confirmed that he had received a copy of the Second Superseding Indictment and that he had reviewed and discussed the charges with his attorney. (Cr. Dkt. 589 at 4−5.) The Court verified that Ochoa-Beltran understood the penalties for each count he faced by pleading guilty. *Id.* at 6−8. The Court reviewed Ochoa-Beltran's rights, the elements of the offenses, the rights he was giving up by pleading guilty, the sentencing guidelines, and discussed the 18 U.S.C. § 3553 factors, and Ochoa-Beltran affirmed he understood. *Id.* at 10−20. Specifically, the Court advised Ochoa-Beltran that the statutory penalty for Count 1 was ten years to life; the statutory penalty for Count 9 was up to 20 years; and the statutory penalty for Count 11 was up to 20 years, and the Court explained that it had the discretion to run the sentences concurrently or consecutively. *Id.* at 6−8, 16−19. The Government then presented the factual basis, and Ochoa-Beltran affirmed that the facts the Government provided were true and he had no changes or corrections. *Id.* at 20−27.

The Court found Ochoa-Beltran was fully competent and capable of entering an informed plea, aware of the nature of the charges and consequences of his plea, and that his guilty plea was

a knowing and voluntary plea supported by a factual basis. *Id.* at 27−28. The Court accepted Ochoa-Beltran's plea and adjudged him guilty of the three counts and scheduled a sentencing hearing  At Ochoa-Beltran's request, his sentencing hearing was continued until October 3, 2019. (Dkt. 600.)

### C.     Co-defendants' Trial

After Ochoa-Beltran pled guilty but before he was sentenced, two of his co-defendants, Guzman-Cordoba and Alvarado-Santiago, proceeded to trial. *United States v. Guzman-Cordoba, et al.*, 988 F.3d 391 (7th Cir. 2021). At trial, Guzman-Cordoba presented a duress defense and testified that she was under duress throughout her involvement in the DTO due to the organization's violence. *Id.* at 398. Specifically, the jury heard evidence that she had been forced to join the drug trafficking organization through violence and threats of violence to herself and her family, and about an incident in which Ochoa-Beltran forcibly extracted the teeth of another man at the Dearborn Street stash house. *Id.* Guzman-Cordoba testified that this conduct was "part of Ochoa-Beltran's efforts to manipulate and control his foot soldiers." *Id.*

### D.     Sentencing

A presentence investigation report ("PSR") was prepared by the United States Probation Office. (Crim. Dkt. 574.)  In its guideline computations, the probation officer grouped Ochoa-Beltran's Counts 1 and 9 pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 3D1.2(d). *Id.* at ¶ 36. Group 1 provided for a base offense level of 36, pursuant to U.S.S.G. § 2D1.1(c)(2). *Id.* at ¶ 37. Ten more levels were added, as follows:  two levels for possession of multiple firearms, pursuant to U.S.S.G. § 2D1.1(b)(2); two levels as a result of the DTO's violence, pursuant to U.S.S.G. § 2D1.1(b)(2); two levels because "the defendant used violence, made credible threats of violence or directed the use of violence," two levels because premises were maintained for the

purpose of manufacturing or distributing a controlled substance, pursuant to U.S.S.G. § 2D1.1(b)(12); and, four levels were added as the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, pursuant to U.S.S.G. § 3B1.1(a). *Id*. at ¶¶ 38−42. Thus, Ochoa-Beltran's adjusted offense level for Counts 1 and 9 was 46. *See id*. at ¶¶ 37-44.

Count 11 had a base offense level of 42, pursuant to U.S.S.G. § 2S1.1(a)(1). *Id*. at ¶ 45. Six levels were then added as follows: two levels were added for a conviction under 18 U.S.C. § 1956, pursuant to U.S.S.G. § 2S1.1(b)(2)(B); and four levels were added as the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, pursuant to U.S.S.G. § 3B1.1(a). *Id*. at ¶¶ 46-48. The adjusted offense level for Count 11 was 48. *Id*. at ¶ 50.

The greater of the adjusted offense levels was 48. *Id*. at ¶ 51. Two levels were subtracted for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a). *Id*. at ¶ 53. Thus, the total offense level was 46, but as the offense level calculated was in excess of 43, the offense level became 43. *Id*. at ¶ 54. Ochoa-Beltran's criminal history category was III. *Id.* at ¶ 62. Based upon a total offense level of 43 and a criminal history category of III, his guideline imprisonment range was life. *Id.* at ¶ 94.

Ochoa-Beltran objected to the following guideline applications: 1) the Government failed to request an additional level for acceptance of responsibility; 2) the role in the offense enhancement; 3) drug amount; 4) the use of violence enhancement; 5) possession of firearms enhancement; and 6) the stash house enhancement. (Crim. Dkt. 581.)

On October 30, 2019, the Court held Ochoa-Beltran's sentencing hearing. To address Ochoa-Beltran's objections, the Government called two agents to testify, while Ochoa-Beltran testified on his own behalf. (Dkt. 712 at 5−93.)

The Court overruled the first objection, concluding that the Government's refusal to request an additional level for a further reduction was legitimately related to the Government's extensive preparation for trial ahead of the last-minute guilty plea (at the final pretrial conference) and not based on any unconstitutional grounds. *Id.* at 10−11.

The Court overruled Ochoa-Beltran's objection to his role in the offense enhancement finding that, based upon the sworn testimony of the witnesses at trial, the testimony of the agents at the sentencing hearing, and the testimony at Lara-Leon's sentencing, it was clear that Ochoa-Beltran was the leader of the DTO. *Id.* at 77−79.

Next, the Court overruled Ochoa-Beltran's objection concerning the drug amount, finding first that it appeared the Government used conservative weight conversions and second that the Government properly calculated the weight by considering the weight of the physical drugs seized, the money seized, the drug ledger transactions, and the money laundering activity, all of which supported the Government's 30,000 kilograms of converted drug weight calculation. *Id.* at 81−82.

The Court also overruled Ochoa-Beltran's objection to the two-level enhancement for the use of violence based on extensive trial testimony about the extent of the violence of the DTO, e.g., a transcript of a telephone conversation in which Ochoa-Beltran described pistol-whipping someone, and the testimony of the agents that they ended their investigation upon hearing of Ochoa-Beltran's plan to hire a hitman to kill two people and at that time made the arrests and obtained search warrants. *Id.* at 89−90.

The Court overruled Ochoa-Beltran's objection to maintaining a stash house based on trial testimony that he ordered the payment of rent for the Dearborn Street house and two other stash houses, and trial testimony that the houses would be abandoned as soon as law enforcement would intercept a package intended for the house. *Id.* at 92−93.

The Court overruled his objection to the firearm enhancement based on the discovery of guns in both the Dearborn Street stash house and the truck which Ochoa-Beltran was following at the time of his arrest. *Id.* at 91−92. In the bed of the truck, agents found a crate containing nine firearms, various magazines and rounds of ammunition, and handwritten notes listing addresses of some of the DTO's stash houses. *Id*.

After ruling on the objections, the Court determined that Ochoa-Beltran's total offense level was 43, his criminal history category was III, and his advisory guideline sentence was life imprisonment. Jones argued for a sentence of 265 months' imprisonment, while the Government argued for a sentence of 480 to 600 months imprisonment. *Id.* at 99−124. The Court sentenced Ochoa-Beltran to a downward variance of 360 months imprisonment (Count 1: 360 months; Counts 9 and 11: 240 months per count, to be served concurrently), to be followed by five years of supervised release. *Id.* at 124−25. Final judgment was entered on November 1, 2019. (Crim. Dkt. 690.)

**E.    Appeal**

Ochoa-Beltran and co-defendant Lara-Leon appealed, but their counsel, finding no nonfrivolous issues, moved to withdraw the representation under *Anders v. California*, 386 U.S. 738 (1976). *United States v. Lara-Leon, et al.*, 843 F. App'x 790, 792 (7th Cir. 2021).

In his appeal, Ochoa-Beltran indicated that he would like to withdraw his guilty plea, but the Seventh Circuit concluded that his plea hearing complied with Rule 11 and that the district

9

court did not commit any plain error. *Id.* at 792−93. The Court reasoned that the district court had advised Ochoa-Beltran of the consequences of testifying falsely; the potential sentences and civil and immigration consequences of pleading guilty; his constitutional rights; and that he had sufficient time to confer with his attorney. *Id.* The Seventh Circuit further found that there was no procedural error at the sentencing hearing and agreed that the below-guidelines sentence that was imposed was substantively reasonable. *Id.* at 793−94.

**F.**     **28 U.S.C. § 2255 Motion**

Ochoa-Beltran's initial *pro se* motion to vacate under Section 2255 claimed that his attorney was ineffective for underestimating his sentence and failing to explain the penalty range he faced. (Dkt. 1.) Later, Ochoa-Beltran filed a memorandum in support of his motion, which the Court construed as an amended motion, that expanded on his original claim and added several claims related to his sentencing. (Dkt. 8.)

### III. DISCUSSION

In his amended motion, Ochoa-Beltran raises the following claims:

- That his plea was not entered into knowingly, voluntarily, and intelligently because his attorney promised him that if he pled guilty, he would be guaranteed to receive a sentence of no more than 18 years, *id.* at 5−9;

- That trial counsel was ineffective for encouraging him to plead guilty, because, had he exercised his right to trial, he would have exposed that the Government's attorneys were maliciously prosecuting him by permitting Guzman-Cordoba to present inflammatory testimony about Ochoa-Beltran's propensity towards violence, *id.* at 9−16;

- That his right to exculpatory material under *Brady v. Maryland*, 373, U.S. 83 (1963), was violated when the Government failed to disclose how it obtained eyewitness statements or other evidence that was presented at his co-defendants' trial and his attorney failed to show him discovery, *id.* at 16−17;

- That his trial counsel rendered ineffective assistance of counsel at sentencing by failing to object to the Government's evidence, *id.* at 17−21; and

- That trial counsel rendered ineffective assistance of counsel by failing to challenge various sentencing enhancements, *id.* at 21−24.

The Court addresses each claim in turn.

A.  **Voluntariness of Plea**

Ochoa-Beltran argues that his plea was entered into blindly because Jones promised him that if he pled guilty, he would receive no more than a 16-year or 18-year sentence. (Dkt. 1 at 4, Dkt. 8 at 5.) The Government argues that Ochoa-Beltran procedurally defaulted this claim and that it is otherwise meritless.

Because this claim can be resolved on its merits, the Court need not address whether Ochoa-Beltran procedurally defaulted it. Whether viewed through the lens of ineffective assistance of counsel or voluntariness of the plea, this claim fails.

For a plea to be valid, it must be made voluntarily, knowingly, and intelligently. *United States v. Schaul*, 962 F.3d 917, 922 (7th Cir. 2020). "[A] defendant is normally bound by the representations he makes to a court during" his plea colloquy. *Hutchings v. United States*, 618 F.3d 693, 699 (7th Cir. 2010). "Justice would be ill-served, and the utility of the Rule 11 colloquy would be undermined, by allowing [a defendant] to renege on his representation under oath to the district court." *Id.* Therefore, "[j]udges need not let litigants contradict themselves." *United States*

*v. Peterson*, 414 F.3d 825, 827 (7th Cir. 2005). "[A] motion that can succeed only if the defendant committed perjury at the plea proceedings may be rejected out of hand unless the defendant has a compelling explanation for the contradiction." *Id*.

Here, the trial court advised Ochoa-Beltran of the sentences he faced by pleading guilty as charged, and that the court had discretion to fashion a sentence within the statutory guidelines. (Cr. Dkt. 589 at 6–8, 16–19.) Ochoa-Beltran affirmed that he understood these ranges and the court's discretion in choosing a sentence. *Id*. Thus, any claim that he was induced through his attorney's inaccurate advice to plead guilty "is belied by his own statements at the change of plea hearing, which are presumed truthful." *Bridgeman v. United States*, 229 F.3d 589, 592 (7th Cir. 2000); *see Hurlow v. United States*, 726 F.3d 958, 968 (7th Cir. 2013) ("[R]epresentations made to a court during a plea colloquy are presumed to be true.") (citation and internal quotation marks omitted).

Further, Ochoa-Beltran cannot show that his trial attorney was ineffective. A petitioner claiming ineffective assistance of counsel bears the burden of showing that (1) trial counsel's performance fell below objective standards for reasonably effective representation and (2) this deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 688–94 (1984); *United States v. Jones*, 635 F.3d 909, 915 (7th Cir. 2011). If a petitioner cannot establish one of the *Strickland* prongs, the court need not consider the other. *Groves v. United States*, 755 F.3d 588, 591 (7th Cir. 2014).

This claim is easily disposed of on the prejudice prong. A petitioner who has pled guilty can only establish prejudice by demonstrating "that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). The petitioner cannot meet this standard with a "mere allegation" but must show a reasonable probability that he would have stood trial with "objective

12

evidence." *United States v. Cieslowski*, 410 F.3d 353, 359 (7th Cir. 2005). Ochoa-Beltran argues in his amended motion that he would have proceeded to trial absent his attorney's promise of an 18-year plea because he received no benefit by pleading guilty since he "was sentenced to the maximum he was exposed to even if he would have exercised [his right to] trial and [been] found guilty." (Dkt. 8 at 9.) But this is simply wrong. Ochoa-Beltran faced a possible life sentence if he proceeded to trial. (Cr. Dkt. 574 at ¶¶ 91−95); *Lara-Leon, et al.*, 843 F. App'x at 794. Ochoa-Beltran benefited by receiving a downward departure for his acceptance of responsibility, and he offers no objective evidence that would make it reasonable for him to proceed to trial. Thus, even assuming that Jones incorrectly predicted the outcome of Ochoa-Beltran's sentence, he has not shown that he would have proceeded to trial.

**B.      Ineffective Assistance—Testimony of Co-defendants**

Ochoa-Beltran argues that Jones was ineffective for advising him to plead guilty because at his co-defendants' trial, the Government presented evidence that "inflamed" Ochoa-Beltran's participation in the conspiracy, and he was unable to challenge those claims. (Dkt. 8 at 9−16.)

Ochoa-Beltran's petition focuses largely on Guzman-Cordoba's testimony related to her duress defense. *Id*. Because that defense was ultimately rejected, Ochoa-Beltran posits that the Government knowingly elicited false testimony in order to exaggerate Ochoa-Beltran's role in the DTO. *Id*. at 11. Ochoa-Beltran also alleges that the Government took advantage of Guzman-Cordoba and cooperating witness Salgado's testimony to show that Ochoa-Beltran was responsible for the most despicable acts of violence. *Id*. at 14.

As an initial matter, Ochoa-Beltran acknowledged during his plea colloquy that he understood that by waiving his right to a jury trial, he also waived his right to confront and cross-examine witnesses at trial. (Cr. Dkt. 589 at 12.)

Ochoa-Beltran has failed to show how he was prejudiced by not going to trial. First, Guzman-Cordoba was a defendant who chose to raise a duress defense—this defense was not orchestrated by the Government. Second, Ochoa-Beltran has not described how his attorney could or should have impeached Guzman-Cordoba's or Salgado's testimonies. Indeed, nothing in the record indicates that this evidence was inadmissible or demonstrably false. Although the jury rejected Guzman-Cordoba's duress defense, it does not follow that the jury wholly disbelieved her testimony about the violence within the DTO. Rather, "the duress defense is limited to circumstances involving threats of immediate or impending death or serious bodily harm," and is generally ill-suited in cases like this where a defendant is engaged in drug trafficking activities over a length of time and at no point tries to flee the area or contact authorities. *Guzman-Cordoba, et al.*, 988 F.3d 391, 389−90, n.3 (citing *United States v. McGee*, 408 F.3d 966, 983 (7th Cir. 2005)).

His allegation that the Government took advantage of Guzman-Cordoba's and cooperating witness Salgado's testimonies to show that Ochoa-Beltran was responsible for the most despicable acts of violence fails because the record shows the Government vehemently opposed allowing Guzman-Cordoba to present her duress defense, which made the allegations of violence relevant at trial. (*See* Cr. Dkts. 479, 502.)

Ochoa-Beltran's argument that his ability to impeach Guzman-Cordoba or Salgado would have resulted in a better outcome at trial is speculative. Indeed, Jones objected to some of the evidence of violence that appeared in the PSR that was presented at Ochoa-Beltran's co-defendants' trial. (Cr. Dkt. 577.) These objections were overruled, however, based on the Court's perception

of the trial testimony, as well as the corroborating evidence at the sentencing hearing which consisted of a recorded telephone call between Ochoa-Beltran and a confidential source in which Ochoa-Beltran bragged about his use of violence, (Cr. Dkt. 641-3 at 41–43, and a law enforcement agent's testimony concerning the planned "hit," Cr. Dkt. 712 at 30, 38–39).

Given the overwhelming evidence against Ochoa-Beltran, Jones did not perform deficiently by advising him to plead guilty. *Premo v. Moore*, 562 U.S. 115, 124 (2011). Ochoa-Beltran received the benefit of an acceptance of responsibility credit at sentencing, and he has produced no evidence that the outcome at trial would have been better given the Government's strong case against him.

### C.    *Brady* Claim

Ochoa-Beltran alleges that his rights were violated because the Government and his attorney failed to disclose *Brady* evidence. "'A *Brady* violation occurs when the prosecution suppresses evidence favorable to the defense and the evidence was material to an issue at trial.'" *United States v. Mandell*, 833 F.3d 816, 824 (7th Cir. 2016) (quoting *United States v. Mota*, 685 F.3d 644, 648 (7th Cir. 2012)). "Material evidence is that which creates a 'reasonable probability that, had [it] been disclosed to the defense, the result of the proceeding would have been different.'" *United States v. Brown*, 822 F.3d 966, 975 (7th Cir. 2016) (quoting *United States v. Stallworth*, 656 F.3d 721, 731 (7th Cir. 2011)).

Ochoa-Beltran asserts that the Government never explained how it obtained the witness testimony it presented at his co-defendants' trial and that his attorney "paid no attention to the importance of providing him with all relevant evidence against or in favor of his case. His attorney was more interested in making him plea, than in presenting him any available means of defense." (Dkt. 8 at 17.) But Ochoa-Beltran goes no further in identifying what evidence either the

Government or his counsel failed to provide him. "Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority." *M.G. Skinner & Associates Ins. Agency, Inc. v. Norman-Spencer Agency, Inc.*, 845 F.3d 313, 321 (7th Cir. 2017). The Court concludes that Ochoa-Beltran has waived any argument that his attorney was ineffective or that the Government violated his rights under *Brady* as it relates to the handling of evidence.

### D. Ineffective Assistance at the Sentencing Hearing

Ochoa-Beltran alleges that trial counsel performed ineffectively at sentencing by failing to object to certain evidence at sentencing and failing to object to some sentencing enhancements.

First, Ochoa-Beltran believes his attorney should have objected to evidence admitted at sentencing, including pictures of a Mexican passport and bank statements, because he claims that these exhibits did not link him to any of the bank transactions and therefore failed to prove he was guilty of money laundering. (Dkt. 8 at 18.) This claim is a non-starter because Ochoa-Beltran pled guilty to money laundering, as the Court pointed out to his attorney when he began to question one of the Government's witnesses about this evidence. (Cr. Dkt. 712 at 24−25.) An attorney cannot perform deficiently for failing to lodge a baseless objection. *Perez v. United States*, 286 F. App'x 328, 331−32 (7th Cir. 2008) (Failure to raise a losing argument or file a futile motion does not constitute ineffective assistance of counsel.).

Ochoa-Beltran claims his counsel should have argued that the two-level enhancement for money laundering along with the "actual crime for money laundering under § 1956" was double-counting, punishing him two times for the same course of conduct. (Dkt. 8 at 23−24.) "In the context of guidelines sentencing, the term 'double counting' refers to using the same conduct more than once to increase a defendant's guidelines sentencing range." *United States v. Vizcarra*, 668 F.3d 516, 519 (7th Cir. 2012). Double counting is generally permissible unless the text of the

16

guidelines expressly prohibits it. *See id.*; *United States v. Nance*, 611 F.3d 409, 413 (7th Cir. 2010) ("Double counting is generally permissible unless the Guidelines say otherwise or there is a compelling basis for implying a prohibition."). The money laundering guidelines applicable to Ochoa-Beltran do not prohibit the "double counting" he alleges occurred. *See* U.S.S.G. § 2S1.1(b)(2)(B). Therefore, because the Court's calculation of the guideline range was accurate, Jones was not ineffective for failing to make a futile objection. *Perez*, 286 F. App'x at 331−32.

Ochoa-Beltran also argues that his counsel failed to challenge his role in the offense enhancement, firearm enhancement, and use-of-violence enhancement. (Dkt. 8 at 21−23.) But Jones did challenge these enhancements by filing objections to the presentence report, (Cr. Dkt. 571), in his sentencing memorandum, (Cr. Dkt. 682), and at the sentencing hearing, (Cr. Dkt. 712 at 11−83). The fact that these objections were overruled does not indicate that Jones was ineffective. *See McElvaney v. Pollard*, 735 F.3d 528, 532 (7th Cir. 2018) (explaining that counsel may provide effective assistance of counsel "even if [a] strategy was ultimately unsuccessful"). And although the Court overruled the objections, Jones argued persuasively and convinced the Court to impose a downward variance sentence of 360 months' imprisonment, rather than 480 to 600 months' imprisonment as argued by the Government.

Ochoa-Beltran's ineffective assistance of counsel claims lack merit, and he is not entitled to relief on any of his claims.

## IV. CONCLUSION

For the reasons explained in this Order, Ochoa-Beltran's 28 U.S.C. § 2255 motion, Dkt. [8], is **DENIED**. The **Clerk is directed to enter final judgment**, to docket a copy of this Order in the underlying criminal case (Case No. 1:17-cr-00165-TWP-MJD-1), and to **terminate** the pending 2255 motion (Dkt. [779]) in that case.

The **Clerk is further directed** to update the docket to reflect that Ochoa-Beltran is currently housed at FCI Sandstone.

## V. DENIAL OF CERTIFICATE OF APPEALABILITY

A habeas petitioner does not have the absolute right to appeal a district court's denial of his habeas petition; rather, he must first request a certificate of appealability. *See Miller–El v. Cockrell*, 537 U.S. 322, 335 (2003); *Peterson v. Douma*, 751 F.3d 524, 528 (7th Cir. 2014). Pursuant to Federal Rule of Appellate Procedure 22(b), Rule 11(a) of the Rules Governing § 2255 proceedings, and 28 U.S.C. § 2253(c), the Court finds that Ochoa-Beltran has failed to show that reasonable jurists would find "it debatable whether the petition states a valid claim of the denial of a constitutional right" and "debatable whether [this Court] was correct in its procedural ruling." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). The Court therefore **DENIES** a certificate of appealability and no certificate of appealability shall issue.

**SO ORDERED.**

Date: 4/17/2024

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Ricardo Ochoa-Beltran, #15865-028
FEDERAL CORRECTIONAL INSTITUTION SANDSTONE
Inmate Mail/Parcels
P.O. Box 1000
Sandstone, Minnesota  55072

Lawrence Darnell Hilton
UNITED STATES ATTORNEY'S OFFICE
lhilton@fisherphillips.com